ODOM, Justice.
 

 On December 30, 1937, Paul H. V. Dejoie and Prudhomme J. E. Dejoie executed a promissory note for $7,000 in favor of the Unity Industrial Life Insurance Company. The makers of the note bound themselves in solido to pay it. To secure the payment of the note, they, on the same day, executed a mortgage on certain property which they owned in the City of New Orleans, the mortgage itself being in favor of the insurance company. The act of mortgage recites that the makers are indebted unto the mortgagee “in the full sum of Seven Thousand and no/100 ($7,-000.00) Dollars which the said mortgagee has loaned and advanced unto the said mortgagor [s] in lawful money, the receipt whereof is hereby acknowledged”.
 

 On September 28, 1939, the Unity Industrial Life Insurance Company filed a petition, alleging that it was the holder and owner, for a valuable consideration, of the note, that the note was overdue, and that nothing had been paid thereon, and it prayed that an order of executory process issue and that the mortgaged property be
 
 *254
 
 sold to satisfy the debt. An order of ex-ecutory process was signed by the judge, and a writ of seizure and sale was issued and placed in the hands of the civil sheriff for execution. The mortgaged property was seized and advertised for sale.
 

 Thereupon, the defendants, mortgagors, brought suit to enjoin the sale, alleging (Paragraph 2 of their petition) that: “Petitioners aver that said Seven Thousand ($7,000.00) Dollar note was drawn by themselves and made payable to the order of the Unity Industrial Life Insurance Company, a Louisiana Corporation, and was given by them ‘For Convenience Only’, and that no money' consideration or other valuable consideration was given therefor.”
 

 In the third paragraph of their petition for injunction, the mortgagors alleged that in the year 1929 Paul H. V. Dejoie borr rowed $700 from the plaintiff insurance company and that Prudhomme J. E. Dejoie borrowed $1,400 from that company, and that as collateral they pledged “certificates of stock from the Louisiana Weekly, a Negro Newspaper, and certificates of stock from the Unity Agency and Loan Company, of which they were stockholders, and of which they were the owners of the stock given as collateral as mentioned hereinabove”. This paragraph of their petition further recites that they “acknowledge that they are indebted unto the Unity Industrial Life Insurance Company in the sums mentioned herein and have made tender of the amounts due by them respectively which was never accepted by said company”.
 

 The fourth and fifth paragraphs of their petition for injunction are lengthy recitals of their reasons for executing the $7,000 mortgage sought to be foreclosed, and why, as they allege, the said note was given by them “For Convenience Only”. They reiterate that no money consideration or other valuable consideration was given therefor. They allege, in sum, that in the year 1934 the Louisiana Insurance Commission examined the books of the Unity Industrial Life Insurance Company and found that its books showed that the collateral of said company in effect at the time of the examination was insufficient to take care of certain loans which had been made by the insurance company to some of the stockholders. Among these loans petitioners mention one made to Constant C. Dejoie for $16,000, one made to Prudhomme J. E. Dejoie (one of the petitioners) for $1,400, and one to Paul H. V. Dejoie (one of petitioners) for $700. (The loans of $1,400 and $700 are those mentioned by the petitioners in the third paragraph of their petition, which loans they admit they owe.)
 

 They allege in the fourth paragraph of their petition that the insurance commissioner required the life insurance company to furnish additional security to make up the deficit of $18,100 “caused by the above loans, or, that the Eighteen Thousand, One Hundred ($18,100.00) Dollar deficit wóuld be charged up against the assets of said Unity Industrial Life Insurance- Company”.
 

 In the fifth paragraph of their petition, they allege that Constant C. Dejoie re
 
 *256
 
 quested that the other directors of the life insurance company make loans in . favor of the company for the amount of $18,100, stating that to charge the assets of the company with the amount mentioned “in paragraph four (4) hereof, would reduce the reserve and impair the Capital of said Unity Industrial Life Insurance Company”.
 

 In the sixth paragraph of their petition, the plaintiffs in the injunction suit allege that Constant C. Dejoie, president and one of the directors of the insurance company, with the consent of the other directors, agreed to take care of each individual loan or mortgage in favor of the company “when said reserve fund was replenished from time to time, with funds therein equaling the principal reserve fund of Eighteen Thousand, One Hundred ($18,-100.00) Dollars, or any one of the mortgages executed in accordance with the above agreement and for the above purpose; that as the mortgage or mortgages, or note or notes secured thereby equalled the amount on deposit in said funds to be used for the ultimate set-off of same, that the said mortgage or mortgage note or notes would be cancelled and erased”.
 

 As we interpret the petitioners’ allegations, what they mean is that the $7,000 mortgage note which they executed in favor of the insurance company was to be held by the company as collateral only, and that, if and when the company’s reserve fund equalled the amount of the collateral notes, the notes were to be surrendered by. the company and returned to the mortgagors, and the mortgages cancelled.
 

 In the tenth paragraph of their petition, plaintiffs in the injunction suit allege that the other notes' and mortgages executed in favor of the life insurance company under the circumstances above stated were subsequently cancelled and erased, and that the note and the mortgage for $7,000 which they executed should have been cancelled along with the others, but were never can-celled.
 

 In Paragraphs 12 and 13, the plaintiffs in the injunction suit reiterate that their understanding in regard to the mortgage which they executed was that it was for collateral only, to take care of the previously mentioned loans, “whereas, in reality, they [the petitioners] were imposed upon in the premises, and were actually obligating themselves by a conventional mortgage, in fraud of their rights, which is substantiated by the cancellation of the aforementioned mortgages, except the one signed by them from which they seek relief and cancellation”; and that, notwithstanding the fact that a sufficient surq was placed in the reserve fund of the insurance company to cancel all the mortgages, including the one which they gave, and notwithstanding the fact that the others were cancelled, yet the one they executed was not cancelled. And in Paragraph 14 they allege that their obligation “was extinguished when the reserve fund was replenished for the purpose of cancelling” the said mortgages, and that “the condition upon which the said mortgage was given was discharged”, and that the refusal of the insurance company, the holder of their note for $7,000, to cancel it and the mortgage securing it was “in violation of the
 
 *258
 
 said agreement and in Fraud of Petitioners’ rights, which Fraud being hereby-pleaded”.
 

 The plaintiffs prayed that a temporary restraining order be granted by the court and that the defendant insurance company be ruled to show cause why it should not be permanently enjoined from proceeding further with its executory proceeding, and prayed further that the $7,000 mortgage note be cancelled and returned to them, and that the mortgage securing the same be cancelled and erased from the records.
 

 The court issued a temporary restraining order.
 

 Before answering and with reservation of its rights, plaintiff in the foreclosure proceeding, and defendant in the suit for injunction, excepted to the petition of the defendants in the foreclosure proceeding, the plaintiffs in the injunction suit, on the ground that it disclosed no right or cause of action, and further interposed a plea of estoppel, which plea was based upon the ground that the mortgagors had solemnly admitted by notarial act “the existence of the mortgage indebtedness herein in the sum of Seven Thousand Dollars ($7,000.-00) and have on said date, acknowledged the receipt of said sum and executed their promissory note therefor, and for security of said amount have issued their unconditional mortgage in conventional form admitting the receipt of the full consideration without qualification and that having admitted said facts by deed they are es-topped from disputing the formal validity of the deed itself and also every fact which the said deed recites. That said estoppel by deed is expressly pleaded herein as a bar and exception to plaintiffs’ petition”.
 

 The trial judge overruled these exceptions and the plea of estoppel on the ground that the plaintiffs in injunction had alleged that the mortgage was extinguished “when the reserve fund was replenished for the purpose of cancelling the aforementioned mortgages”.
 

 The defendant in the injunction suit then filed answer, in which it denied plaintiffs’ allegations that the particular mortgage for $7,000 involved in the suit was given' without consideration, and alleged in this connection that the said note and the mortgage securing the same were given for a valuable consideration had and received by the mortgagors. It further specifically denied that the note and the mortgage had been extinguished or satisfied in the manner alleged by the mortgagors.
 

 The suit for injunction was tried, and testimony covering 360 pages of the record was introduced, and 91 exhibits were filed. The trial judge recalled the- preliminary restraining order which he had granted and rejected the demands for an injunction; whereupon the defendants in the foreclosure proceeding, plaintiffs in the injunction suit, asked for a suspensive appeal from the court’s ruling, which appeal was denied. From this ruling plaintiffs in injunction applied to this court for writs, which were refused. They then appealed devolutively from the judgment. Their devolutive appeal was dismissed by this court on the ground that the issues presented were moot, the property involved
 
 *260
 
 having been sold. See Unity Industrial Life Ins. Co. v. Dejoie et al., 197 La. 38, 200 So. 813.
 

 Subsequently, the case was set down for trial on its merits, the defendants’ suit for injunction having been finally disposed of. The case on its merits was submitted on the testimony adduced and the exhibits filed at the trial of the suit for injunction, and the following judgment was rendered: “It is ordered, adjudged and decreed that there be judgment-in favor of plaintiff in suit and defendant in injunction, the Unity Industrial Life Insurance Company, and against the defendants in suit and plaintiffs in injunction, Prudhomme J. E. Dejoie and Paul H. V, Dejoie, rejecting the demands of the defendants' in suit and plaintiffs in injunction, at their costs.”
 

 From this judgment defendants in- suit "and plaintiffs in injunction appealed devolutively to this court.
 

 Counsel for the Unity Industrial Life Insurance Company argue that their exceptions of no cause and no right of action and their plea of estoppel should have been maintained by the lower court, and should now be maintained by this court. They say in their brief that their exceptions and their plea of estoppel were based upon the fundamental proposition that the mortgagors, having admitted by solemn authentic act of mortgage that they were indebted unto the insurance company in the sum of $7,000 for money loaned to them by the mortgagee, “the receipt whereof is hereby acknowledged”, are estopped from disputing the facts recited in the notarial act. In support of their contention they cite Article 2236 of the Revised Civil Code, which provides that:
 

 “The authentic act is full proof of the agreement contained in it, against the contracting parties and their heirs or assigns, unless it be declared and proved a forgery.”
 

 And cite also Article 2276, which provides that:
 

 “Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since.”
 

 In their brief counsel quote the following extract from the case of Gaines v. Crichton, 187 La. 345, 174 So, 666, 668:
 

 “Where a party solemnly admits a fact by deed, he is estopped from not only disputing the deed itself, but also every fact which the deed recites.” (Citing Karcher v. Karcher, 138 La. 288, 70 So. 228; Reliance Homestead Ass’n v. Brink, 173 La. 331, 137 So. 52.)
 

 Counsel cite also the cases of Franton v. Rusca, 187 La. 578, 175 So. 66, and Johnson v. Johnson, 191 La. 408, 185 So. 299. They say that each of the cited cases supports the fundamental rule laid down in the above quoted articles of the Code.
 

 The codal provisions and the cases cited by counsel support the general rule invoked by them. But there is an exception to this general rule, which exception has been repeatedly recognized by this court, the exception being that, where a party to an authentic act alleges that he
 
 *262
 
 executed it through fraud or error, he is permitted to introduce parol testimony to support such allegations.
 

 In the case of Franton v. Rusca, supra .[187 La. 578, 175 So. 68], this court said:
 

 “It is the well-settled and unbroken rule ,of law in this state that, in the absence of any allegation of fraud or error, conditions, and stipulations beyond those expressed in an authentic act, and what may have been said before, or at the time of, or since the execution thereof, can be proven only by means of a counter-letter or by the use of interrogatories on facts and articles.” (Citing numerous decisions of this court.)
 

 The mortgagors in the case at bar admitted in their pleadings that they executed the mortgage, but alleged that their understanding was that it was to be held by the insurance company as collateral only, and was to be extinguished when the reserve fund of the insurance company was replenished and became sufficient to satisfy a deficit which the insurance commissioner of the state had found to exist; that as a matter of fact the reserve fund of the company was replenished and became sufficient to cancel the deficit; that they were induced by the president and the board of directors of the company to believe that they would not be called upon to pay and satisfy the note and the mortgage in case the so-called reserve fund was replenished. In Paragraph 12 of their petition for injunction they alleged specifically that “they were imposed upon in the premises” and were induced to sign what appeared on its face to be an unconditional, conventional mortgage “in fraud of their rights”. They make it plain by their allegations as a whole that they executed the mortgage through error and fraud, induced by representations made to them by the president and the directors of the insurance company. The trial judge thought, and we think, that the mortgagors' allegations of fraud and error were such as to permit the introduction of parol testimony in support of their contention that the note and the mortgage were given “For Convenience Only”, and that “no money consideration or other valuable consideration was given therefor”; and, further, that their allegations were such as to permit them to prove, if they could, that the obligation, if in fact based upon a sufficient consideration, had been extinguished.
 

 The trial judge, in deciding the case on its merits, considered all the testimony and exhibits filed, and reached the conclusion that defendants in the foreclosure proceeding, and plaintiffs in the suit for injunction, had utterly failed to sustain any of their contentions, and that’the plaintiff in the-foreclosure proceeding was entitled to judgment against defendants. We have carefully read the testimony adduced at the trial and have examined the exhibits introduced and filed. Our conclusion is that the judge did not err.
 

 The testimony and exhibits show beyond question that, at the time Paul H. V. Dejoie and Prudhomme J. E. Dejoie executed the note and mortgage involved, they were indebted unto the insurance company in the full sum and amount stated for money loaned and advances made to them by the insurance company. The record
 
 *264
 
 establishes beyond question that this note and the mortgage were not given, as the mortgagors alleged, “For Convenience Only" and to be used as collateral security for a deficit which the insurance company had sustained.
 

 The company filed in evidence an itemized, detailed statement showing each and every item of the indebtedness claimed against the defendants. Among these items are the notes, one for $1,400 and one for $700, which the defendants admitted in their pleadings that they owed the company. Another is a check dated September 30, 1935, for $2,397, payable to P. J. E. Dejoie. Another item is a check of the insurance company, payable to P. H. V. Dejoie, for $400. Another item listed is $485.81 for city and state taxes paid by the insurance company for these defendants, and another item for $253.15 is for city taxes- paid. Two other items listed are $252, interest for the years 1935, 1936, and 1937 on the $1,400 loan to Prudhomme J. E. Dejoie, and $84, interest for the years 1936 and 1937 on the $700 loan to Paul H. V. Dejoie. There are other items of indebtedness listed, all of which, including the above, amount to $7,001.03. The can-celled checks and vouchers showing that the advances were made are in the record.
 

 The testimony and the exhibits show that the advances and loans were all made to these defendants by the insurance company, and the testimony of numerous witnesses called by the company shows that none of the items had been repaid by defendants at the time the mortgage was granted, and that all these items of indebtedness were lumped together, and the mortgage and the note executed to cover the entire amount.
 

 It was not shown that the witnesses who testified for the insurance company had any personal interest in the outcome of this litigation. C. C. Dejoie, one of the witnesses, was a stockholder in, and president of, the company from 1921 until late in 1939. The other witnesses either were stockholders and members of the board of directors or were employees of the company. The defendants Paul and Prudhomme Dejoie were stockholders, and Prudhomme was a member of the board of directors long prior to, and after, the time this mortgage was executed. The father of Prudhomme and Paul, it appears, organized the company and was its first president. He and C; C. Dejoie were brothers. Other members of the Dejoie family were stockholders and members of the board, and were called as witnesses by the company. The members of the Dejoie family are colored people of considerable business ability. They owned and controlled the company from the time it was organized until the latter part of 1939. In the latter part of 1939, they and other stockholders sold their stock and the assets of the company to other people.
 

 Thus, when the case was tried, the witnesses C. C. Dejoie, Mrs. Vivian Dejoie, Aristide Dejoie, all relatives of the defendants, and Joseph P. Geddes, the latter being called as a witness for the defendants, —all former stockholders and some of them members of the board — were no longer interested in the affairs of the company. Leonard Howard and B.. E. Webb were
 
 *266
 
 connected with the company when the suit was tried. Each of these except Geddes was called by, and testified for, the company. Their testimony abundantly supports the company’s contention that the defendants were indebted to it in the full sum of $7,000 at the time the mortgage here involved was given. Some of them testified that defendants had repeatedly admitted the indebtedness, and the others said that they never denied it. In his short written opinion, the trial judge made the following comment on the testimony of the defendants and of the witnesses who testified for the company:
 

 “It is impossible for me to believe the statements of these two men [the defendants], especially those of Prudhomme, because they are obviously untrue. It is further impossible to believe that all of the other persons connected with the Insurance Company have formed a conspiracy to defraud the two defendants, plaintiffs in injunction, who are their relatives and, as far as the record shows, their intimate personal friends of many years’ standing.”
 

 The witness Geddes, who was called by the defendants, testified that he was a stockholder in the company and a member of its board of directors. He stated repeatedly that Prudhomme Dejoie, who was also a stockholder and a director, had admitted at least four times at meetings of the board that he and his brother Paul were indebted to the company in the sum of $7,000 at the time they granted the note and mortgage herein involved. The trial judge took over the witness, stating that he wanted to understand definitely just what the witness intended to say. The judge asked the witness whether he intended to say that Prudhomme Dejoie admitted to him and the other members of the board of directors that he and his brother owed the company $7,000. The witness told the judge that that was what he intended to say. Counsel for defendants further questioned this witness, the questions indicating that he, counsel, did not understand what the witness intended to say. The judge took the witness again and explained to him that he, the judge, wanted to know exactly what he, the witness, intended to say. The judge questioned him further, and the witness iterated and reiterated that what he intended to say was that Prudhomme^ Dejoie admitted that he and his brother had received the full amount of $7,000 from the company and that they were indebted to the company for that amount at the time they executed the mortgage. Thereupon, the witness was dismissed from the stand, and the court recessed for lunch.
 

 After the lunch hour, the witness Geddes was recalled to the stand by counsel for defendants. Counsel for the insurance company objected to his being recalled, but the court overruled the objec-tion. The witness Geddes then, on being questioned by counsel for the defendants as to the meaning of his testimony given before the recess, stated that he was confused when he testified before, and that what he had meant to say was that the company was indebted to Paul and Prudhomme Dejoie in the sum of $7,000. In other words, he completely reversed the testimony which he had given in the fore
 
 *268
 
 noon. On being questioned as to whether he had talked with counsel and Prudhomme during the noon recess, he stated that he had. The witness stated that neither counsel nor Prudhomme had suggested to him that the testimony which he had previously given was not true. He said that all counsel did was to ask him just what he meant by his previous testimony. The witness then testified that, after thinking the matter over, he recalled that he had testified that Prudhomme had admitted that he and his brother owed the company $7,000, whereas he should have said that the company owed them $7,000.
 

 This part of Geddes’ testimony is obviously untrue. He said he was confused, but he admitted that he had been on the witness stand before in other cases — that he was “no stranger to the witness stand”. He admitted that he- was a business man of experience and that he was at the head of the Geddes’ undertaking establishment in the City of New Orleans. It is unbelievable that, if he was confused at all, he was so confused as to say at one time that Prudhomme Dejoie admitted that he and his brother were indebted to the company and in the next breath say that he understood from the conversations which took place at the meeting of the board of directors that the company owed the Dejoies $7,000.
 

 Furthermore, the witness testified in the forenoon that he had voted at one time to remit the debt which the Dejoies owed the company; that the Dejoies stated that they had no money with which to pay the debt or otherwise they would pay it. He testified that they said they did not even have the money to pay the taxes on the property and could not pay the debt, and Geddes said for these reasons he felt sorry for them and so voted to remit the debt. It is unreasonable to suppose that, if he felt interested in the Dejoies, he would have voted to remit a debt which the company owed them. Our opinion is that this witness did not tell the truth when he testified in the afternoon. The trial judge was evidently of the same opinion.
 

 The defendants testified that as a matter of fact they had paid some of the items of indebtedness to the company, but they admitted that they had no receipts for the amounts so paid,, and, as we have stated, they admitted in their pleadings that they still owed the company $2,-100. These defendants executed an act of mortgage, passed before a notary and two witnesses, declaring that they were indebted to the company “in the full sum of Seven Thousand and no/100 ($7,000.00) Dollars which the said mortgagee has loaned and advanced unto the said mortgagor^] in lawful money, the receipt whereof is hereby acknowledged”. There is nothing in the record to show that they were defrauded or misled into making that declaration or admission in their solemn act of mortgage. The defendants are not ignorant, unlettered men. Prudhomme Dejoie testified that he was connected with the life insurance company from 1923 until 1939, and that he was vice-president and treasurer from 1929 to 1939. He was also a member of the board of directors. He
 
 *270
 
 said he was vice-president and treasurer when he executed the note and mortgage. Paul Dejoie said he signed the note and mortgage at Prudhomme’s request. Our conclusion therefore is, and we hold, as did the district judge, that this mortgage and the note were given for a valuable consideration.
 

 There is no merit in defendants’ plea or contention that the debt evidenced by the note and the mortgage has been extinguished. As relating to this defense, their contention now is that the note was paid or extinguished with funds which accumulated in the company’s so-called “sinking fund”. The testimony shows that this so-called “sinking fund” was in no way connected with the company’s legal reserve fund. Defendants’ contention now is that it was understood by them and by all the members of the board of directors that, when this so-called sinking fund equalled the amount which they and some of the other stockholders and directors owed the company, their indebtedness to the company would be extinguished, and that, as a matter of fact, the accumulations in that fund did become sufficient for that purpose.
 

 It is true that the board of directors did set up what they called a “sinking fund”, the purpose of which was to pay the indebtedness due by them individually to the company. But the' fact is that the money put into this so-called sinking fund was money which belonged to the company itself.
 

 The facts relating to the establishment of this so-called sinking fund were stated by C. C. Dejoie, the president of the company at the time it was agreed to establish this fund, and his testimony is not disputed. He was asked how the sinking fund was started, and he answered:
 

 “A. By padding certain’ salaries and adding to certain other salaries.
 

 “Q. Now, when you say ‘padding certain salaries’, explain to the Court what you mean by that? A. Increasing them, and yet, the recipient didn’t receive the full amount of the increase.
 

 “Q. Did the employees know that that was going on? A. They did not.
 

 “Q. How was that handled? A. It was handled by the auditing department.
 

 “Q. Who was in charge of the auditing department? A. Mr. Howard and Mr. A. Dejoie and Prudhomme Dejoie.
 

 “Q. Now, is it or is it not a fact that the padding of the payrolls couldn’t have been accomplished without Prudhomme Dejoie knowing it? A. Positiyely..
 

 “Q. He was one of the three in charge of that department, was he not? A. Yes. He made up the monthly reports.
 

 “Q. Was it the custom to permit the clerks to take a few days vacation each month, but pay them as though they had worked for the whole month, and, without their knowledge, extract that two days pay and put it in the sinking fund? A., It was.
 

 “Q. Can you tell the Court whether or not it was also the policy to carry people
 
 *272
 
 on the payroll whp were not in the employ of the company? A. We did at that time.
 

 “Q. Do you recall who those particular people were? A. No, I don’t remember the names now.
 

 “Q. If I should mention to you the names of Ellen and Florence Palfrey, would that refresh your memory ? A. They were two.
 

 “Q. They were two what? A. Two clerics that were supposed to be employed and salaries were paid to them, but they didn’t receive it.”
 

 He testified that the books of the company did not show all this. He said that a special account which he kept himself did show it — did show the fictitious names that were carried on the payroll. He was asked: “And he [Prudhomme Dejoie] knew that you folks were peculating the company’s funds in this manner?” Counsel for defendants objected to the use of the word “peculating” and stated to the court that he did not see anything illegal in this procedure so far as Prudhomme Dejoie was concerned. The witness C. C. Dejoie then made the following statement to the court:
 

 “I want to say this, — that we didn’t consider that we were peculating at all. We owned the company. We thought we had a perfect right to take moneys out of the company and use them to pay ouri debts, because we owned the company. There was nobody to question anything we did."
 

 The witness made it clear that the company’s books did not show this padding of the payrolls in order to build up this so-called sinking fund.
 

 Now, these defendants admit that they owe the company $2,100 which they borrowed from it in 1929, and the testimony shows beyond doubt that the moneys advanced to them after the so-called sinking fund was set up were advanced to them out of that fund, which, as stated, was the company’s money. So, as a matter of fact, these defendants are indebted to the company for the amount claimed. They received the company’s money, for the reimbursement of which they are liable.
 

 The record contains a great deal of testimony relating to the other mortgages given by these defendants and others connected with the company. But we think this testimony bears no relevancy to the only issue .here involved, which is whether the defendants are indebted to the company, and for that reason we shall not discuss it.
 

 For the reasons assigned, the judgment appealed from is affirmed.
 

 McCALEB, J., takes no part.
 

 ROGERS,
 
 J.,
 
 absent.