371 So.2d 257 (1979)
Jackie Ray KING et al.
v.
PEOPLES BANK AND TRUST COMPANY et al.
PEOPLES BANK AND TRUST COMPANY
v.
Julius D. GILL.
No. 63202.
Supreme Court of Louisiana.
April 9, 1979.
*258 Donald R. Miller, Shreveport, for plaintiffs-applicants.
Edwin L. Blewer, Jr., Cook, Clark, Egan, Yancey & King, Shreveport, for Sheriff Harold M. Terry, respondent.
David M. Touchstone, Shreveport, for defendants-respondents.
SUMMERS, Chief Justice.[*]
An understanding of the issues presented for decision in this case requires a review of the somewhat complex chronology of events giving rise to this litigation. Jackie Ray King and Cecile Ford King are husband and wife. On April 13, 1973 they acquired a lot in North Park Estates, a subdivision in Caddo Parish. By late fall, in 1977, they had decided to build a house on the lot. In keeping with this decision they caused plans and specifications to be drawn, and made inquiries about a contractor; in that connection a neighbor suggested they get in touch with Julius Gill.
Gill was contacted, and an agreement was reached whereby Gill would build the King house. Gill had done business with the Morehouse Branch of the Peoples Bank and Trust Company since the spring of that year, and he recommended that the Kings approach the bank about interim financing.
On November 29, 1977 the Kings and Gill entered into a contract for the construction of the house. The contract was drawn by Gill and specified a price of $67,200. Although the record does not clearly reveal whether the contract preceded or followed the visit to the bank, about that time Mrs. King visited the Morehouse Branch of the Peoples Bank and Trust Company and spoke with O. C. Albritton, the Branch Manager, about interim financing for the house construction. She testified that Albritton told her it would be necessary for the Kings to deed the lot to Gill against a counter letter in order for financing to be arranged.
During this conversation, according to Mrs. King, Albritton told her that it would be necessary for the Kings to obtain a "take-out letter" from the permanent financing institution, guaranteeing the bank that interim financing would be terminated upon completion of the house. J. E. Collum, president of the bank, testified that such a letter, dated November 21, 1977, was received from Postal Employees' Credit Union, guaranteeing permanent financing in the amount of $45,000. He further testified that the bank would not, in this or any *259 other instance, have agreed to undertake interim financing without such a guarantee. Although the take-out letter formed a regular feature of the bank's interim financing arrangements for construction, it was immaterial to the bank whether such permanent financing was arranged by or for the builder or by or for the ultimate owners; the bank merely wished to be assured that the interim financing arrangements would be closed out when construction was completed.
Sometime prior to December 8, 1977 Albritton called the offices of Hal V. Lyons, an attorney and notary in that parish. Albritton spoke with Lyon's wife and secretary, instructing her to have a loan package drawn to permit interim financing for Gill to construct a house on the King lot. He also instructed her to have the title checked on the King lot. The bank knew the purpose of the transaction was to arrange for the Kings' house to be built by Gill and so notified Lyons.
Lyons had handled a large number of transactions for the bank and in this transaction acted for the bank. He did not represent the Kings. He had, however, later in the course of events, handled some of Gill's disputes with his creditors, services for which either Gill or the Bank paid.
The loan package consisted of a deed in authentic form from the Kings to Gill, prepared upon the instructions of the bank. This recited the payment by Gill, and the receipt by the Kings of $5,375, as consideration for the sale, which, however, was never paid.
The second part of the loan package was a mortgage in authentic form for $35,000 executed by Gill in favor of the bank.
The third part of the package was a counter letter from Gill to the Kings, acknowledging that the deed transferring the King lot to him was "to allow me to obtain the necessary interim financing to construct you a residence." The letter further acknowledged that the Kings were "the true owners of said property" and Gill set forth that he would "reconvey same to you at the time of the closing of the permanent financing loan, or any other time you request." Although the counter letter was not referred to in the bank's instructions to the attorney Lyons, the Branch Manager knew of it. The President of the bank later testified that the use of a counter letter in such a situation was new to him, but Lyons testified it was his usual practice and the general practice in the area.
The fourth part of the loan package was an engineering certificate. This is not material to any point in dispute and will not be discussed further.
On December 8, 1977, the Kings, Gill and Albritton went to Lyons' office, although it is not clear how long Albritton remained. All three items in the loan package, the deed, the mortgage and the counter letter, were executed. Lyons was the notary on these transactions and later recorded the mortgage and deed; he retained the original of the counter letter, did not record it, and later gave it to Mrs. King upon her request. It is not clear why the counter letter was not delivered at the time; Lyons himself indicated it was a mere oversight. He pointed out, however, that had the counter letter been recorded the function of the transfer and mortgage, to give the bank priority over liens and privileges arising from the construction, would have been frustrated. The purpose of the counter letter, he said, was, rather, to protect the Kings in the event Gill died and his succession attempted to collate the property in question.
The Kings testified in this regard that both Albritton, at the conference in late November, and Lyons, at the execution of the instruments, assured them that the effect of the counter letter was fully to protect their interest and that they had nothing about which to be concerned.
To complete his financing of the construction, Gill gave the bank a hand note covering his initial draw against the $35,000, the note being secured by the pledge of the mortgage and mortgage note bearing against the lot. Also, the bank asked for and received a pledge of a $3,000 savings *260 account in Gill's name, an amount provided by the Kings for this purpose, a fact known to the bank.
On January 12, 1978, the bank and Gill arranged interim financing for construction on three unrelated lots situated in a development known as One North Place, lots he had acquired from the developers of the subdivision. The developers were Collum, President of the bank; Kenneth Arnold, Chairman of the Board and Chief Executive Officer of the bank; and Michael Asaff.
On January 31 a real estate appraiser selected by the bank made the first inspection of construction on the King property, and gave the bank a certificate upon which the first draw was authorized. A second advance of $10,000 was authorized on February 3, and by April the entire $35,000 represented by the mortgage was outstanding and evidenced by Gill's hand notes secured by the collateral mortgage and pledge.
In the course of the spring and early summer, Gill ran into trouble with his suppliers, and it is suggested that a number of them contacted him threatening to file liens on the property or properties on which his construction projects were in progress. During construction of the King house, dispute arose between Gill and the Kings as to the details of the work, the workmanship and changes made from the original specifications. Some, at least, of the changes were requested or authorized by the Kings and some money was paid to cover the added costs of these changes.
About the end of the second week in June 1978, Gill spoke to Lyons about his problems with his suppliers and the threatened liens. By June 27, 1978 having exhausted the original $35,000 loan from the bank, Gill was being besieged by unsatisfied suppliers and subcontractors threatening to file liens against the property. On this date Collins, the President of the bank, took personal charge of the Gill account. In order to protect the bank's interest, and being unaware at the time which of the potential liens were labor liens which might prime the bank's original mortgage, he ordered a second mortgage against the King property in the sum of $85,000. Proceeds of this loan were to be disbursed directly to the potential lienors. Lyons was the notary on this June 27 mortgage also.
It was then that Lyons wrote to Gill on June 27 advising that the bank was demanding payment of the mortgage in full. On the same day Lyons wrote to the Kings advising that the bank demanded payment of the $35,000 by June 30. He further advised that, due to cost overruns, it was necessary that he negotiate another mortgage in the amount of $85,000 to cover all lienable items on the construction, and, unless the permanent financing was accomplished within ten days, the house would be sold on the open market. The mortgage for $85,000 was executed by Gill that day. Lyons acted as notary.
To evidence the draws against this second mortgage Gill executed a $27,878.56 hand note. The money was paid directly to the suppliers and subcontractors for expenses incurred for the construction on the King lot. There is no evidence that these monies were used to pay bills for the houses being built by Gill on other lots.
The bank's position was that it could await the filing of the liens, and thereby get into possible litigation and the certain need to clear the records; it could foreclose; or it could extend additional financing to enable Gill to clear himself with the suppliers and subcontractors. They chose the last alternative and obtained a mortgage in an amount large enough to satisfy all claimants, although only $62,878.56 was ever claimed against the Kings on both mortgages, an amount well within the contract price agreed upon by the Kings and Gill. As the President of the bank testified, the amount of the second mortgage was merely a convenient amount to cover the advances to be made. It was not the amount of the mortgage which was significant, but rather the actual draws evidenced by hand notes as in the first mortgage.
The Kings argue that one of the motivations behind this action was to clear Gill with the suppliers so that work could be *261 continued on the other three lots acquired from the partnership in which the bank's officers were interested. The testimony of the President and Branch Manager, with reference throughout to a file apparently consulted by each while on the stand, indicates that there was some tendency to treat all of Gill's transactions with the bank as part of a common problem. The Kings argued such an inference is given a semblance of validity by the fact that there were one or two houses under construction besides the King residence and the three on lots purchased from the Collum-Arnold-Asaff partnership. The evidence is insufficient to warrant a finding, however, that this common treatment was more than the bank's natural tendency to keep all its transactions with a single customer in somewhat the same place and to bear one in mind when another came up for discussion. There is nothing but a tenuous inference to controvert the bank's assertion that each transaction, with Gill and with every other customer, was a separate and distinct item of business and so handled.
By July 7, 1978 the bank had advanced a total of $27,878.56 on the second mortgage, or a total of $62,878.56 on both. Mrs. King and her attorney visited Lyons on July 10 at which time she received the original counter letter which was subsequently recorded. On July 12 the bank received its second and final report from the real estate appraiser that the construction had been completed to the third stage, which the record indicates was the final stage of construction.
On the strength of their belief that the counter letter gave them ultimate title to the house, the Kings moved in on the 2nd or 3rd of August. On the 10th there was a meeting with the bank's attorney (not Lyons) during which the Kings' claims against Gill were discussed.
According to the claim eventually asserted in their suit against Gill and the bank, the Kings set forth this accounting:

"Original Contract Price .......... $67,200.00
 Plus extras agreed upon............ 11,823.04
 Total contract price with extras... 79,023.04
 Paid on the original contract ..... 13,000.00
 __________
 Balance .............. $66,023.04
 Payment on the extras by Mr. and
 Mrs. King .................... $ 8,596.00
 __________
 Balance ............... $57,427.04
 Cost to correct construction ... $25,309.00
 __________
 Balance owed .......... $32,118.04"

After failing in attempts at a negotiated settlement with Gill and the bank, the Kings filed suit on August 21, 1978, seeking a judgment declaring both mortgages void ab initio; decreeing the deed from the Kings to Gill on December 8, 1977 to be a simulated transaction and null; to have the amount owed to Gill under the building contract determined to be $31,118.04; and for an injunction restraining the bank and Gill from foreclosing on the King property.
The next day, unaware of the King suit, the bank filed its petition for foreclosure by executory process on the two mortgages.
Thereafter, on August 30, the Kings wrote to the bank and Gill, notifying them that, because of their failure to make proper disclosure under provisions of the Consumer Credit Protection Act (15 U.S.C.A. §§ 1638 and 1639), the Kings were exercising their rights to rescind the mortgages affecting their property. They requested cancellation of the two mortgages.
On August 31, the Kings intervened in the bank's foreclosure proceeding in an effort to enjoin the foreclosure restating the claims asserted in their suit of August 21.
On September 18, 1978 the bank filed an exception of no cause and no right of action to the Kings' suit and to their petition of intervention. The cases were consolidated for trial. The exceptions were sustained on October 6, 1978, and the Kings' suit and intervention were dismissed.
The trial judge rejected the contention that the Kings were entitled to a recision on the basis of the Federal Consumer Protection Act because the Kings were not customers of the bank as contemplated in the Act. He rejected any claim of fraud on the part of Gill or the bank. He found that the bank was a third party to the mortgages as defined in Section 2722 of Title 9 of the Revised Statutes, and as such were entitled *262 to rely upon the public records. The counter letter, in his opinion, could have no effect upon the bank.
An application by the Kings to the Second Circuit for certiorari was denied.
Three issues are presented for consideration by the Court:
First, the Kings contend that the transfer of the lot to Gill, being without actual payment of the recited consideration, was a mere simulation and hence void.
Second, they contend that the original interim financing agreement, consisting of a transfer to Gill, a counter letter executed by Gill in favor of the Kings, and a mortgage upon the lot given by Gill to the bank constituted a consumer credit transaction within the contemplation of the Federal Consumer Credit Protection Act. (15 U.S. C.A. §§ 1601-1681t). It is asserted that the bank and Gill were the "suppliers" and "arrangers" of credit within the meaning of the Act, and the Kings were the consumers whom the Act intended to protect in a transaction of this kind. In this situation, the Kings contend, they are entitled to invoke the right of recision provided for in the Act.
Third, the Kings contend that the bank is not entitled to claim the status of a third party acting upon the faith of the public record because, they say, the bank was in reality a party to the transaction with Gill.
The contention that the sale of the King lot to Gill was a simulation is without merit. To the contrary, it was a transaction fully agreed upon by the Kings, and one in which they joined to accomplish a purpose and result they sought in order that their house could be constructed. They are not in a position to attack that deed as we shall show.
The really viable issue here is the validity of the $85,000 mortgage. And, since the result we have reached would be the identical result reached under the Consumer Credit Protection Act, there is no necessity to discuss the contention raised under that Act. A suit on that issue by the Kings against the bank is pending in the Federal District Court for the Western District of Louisiana in Shreveport. The Federal Judge has stayed those proceedings pending the finality of this suit.
Insofar as the first $35,000 mortgage of December 8, 1977 is concerned, the record amply supports the conclusion that the Kings negotiated for and approved that mortgage in favor of the bank. By their participation they were aware that they were permitting Gill to be interposed for that purpose in order to meet the bank's policy which was designed to give its loan a preference over potential lien claimants arising from the construction. After understanding that they were conveying their property to Gill to enable him to obtain interim financing, they cannot now claim that transaction as a fraud or simulation, or seek its recision on the ground that Gill was not the true owner and the bank was not entitled to rely upon the public record doctrine. Their express consent manifested by their signatures on the sale to Gill and the implication from that fact, together with the circumstances that the sale and mortgage by Gill to the bank were simultaneously executed, make the Kings, in effect, parties to the entire transaction.
The second $85,000 mortgage of June 27, 1978, however, does not fall into the same category. The Kings did not consent to that mortgage. And we do not agree with the trial judge that the bank is entitled to be considered third parties under the public records act. Accordingly, the Kings are entitled to an injunction to prohibit foreclosure by the bank on this June 27, 1978 mortgage in the amount of $85,000. That mortgage is therefore rescinded, insofar as the Kings and their property are concerned, for the following reasons:
With respect to the $85,000 mortgage the question is whether the bank should be treated as a third party for purposes of the public records doctrine; that is, should the bank be allowed to rely upon the public records showing Gill to be the owner of the property when the $85,000 mortgage was executed in their favor.
*263 The bank relies upon Sections 2721 and 2722 of Title 9 of the Revised Statutes and the public record doctrine espoused by McDuffie v. Walker, 125 La. 152, 51 So. 100 (1910), to protect them against the claim by the Kings that they were aware of the fact that the Kings were the true owners of the property, and that Gill was without authority to mortgage the property in this latter instance.
Section 2721 provides:
"No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated; and neither secret claims or equities nor other matters outside the public records shall be binding or affect such third parties."
Section 2722:
"Third persons or third parties so protected by and entitled to rely upon the registry laws of Louisiana now in force and effect and as set forth in this Chapter are hereby redefined to be and to include any third person or third party dealing with any such immovable or immovable property or acquiring a real or personal right therein as purchaser, mortgagee, grantee or vendee of servitude or royalty rights, or as lessee in any surface lease or leases or as lessee in any oil, gas or mineral lease and all other third persons or third parties acquiring any real or personal right, privilege or permit relating to or affecting immovable property."
The bank contends that neither the counter letter, which declares that the property in question was transferred to Gill to facilitate interim financing and that the Kings were the true owners of the property, nor the bank's knowledge that the Kings had transferred the property to Gill to facilitate interim financing can avail to affect their mortgage. This position is based upon the premise that the counter letter was not filed of record and the fact that the bank was aware that the Kings, and not Gill, were the true owners was also a matter dehors the public record.
According to Article 3342 of the Civil Code, conventional mortgages are acquired only by the consent of the parties. In the instant case the bank was aware of the fact that the Kings were the true owners of the property mortgaged. Nevertheless, it sought to encumber the King property by having Gill execute the mortgage without the consent of the Kings.
Article 3342 also provides that mortgages, and the same applies to sales, are only allowed to prejudice third persons when they have been publicly inscribed on records kept for that purpose. McDuffie V. Walker, supra. Thus, in the case of the sale from the Kings to Gill we are called upon to determine whether the bank was a third person who was entitled to rely upon that deed as a conveyance to Gill.
Article 3343 of the Civil Code is pertinent to this determination. The article defines third persons as used in Article 3342 to be "all persons who are not parties to the act." And Article 3344 sums up the effect of the two preceding Articles as follows: "Consequently, neither the contracting parties nor their heirs, nor those who were witnesses to the act by which the mortgage [or sale] was stipulated, can take advantage of the noninscription of the mortgage [or sale]."
Under the circumstances of this case we deem it appropriate to hold that the bank was a witness to the act of sale from the Kings to Gill. Lyons, the attorney for the bank, signed the sale as notary. As the bank's attorney he designed the entire loan package under their instructions and in keeping with their policy in such cases. His actions were in fact the actions of the bank, and his knowledge should be imputed to the bank as much as would be the case if the President of the bank had signed the deed as a witness.[1] As a fictitious legal person *264 the bank could not act except through its officers, agents or attorneys.
As a witness to the act of sale, the bank acting through its attorney, was aware that the sale was without consideration. Lyons, having prepared the loan package and counter letter, was aware that the Kings remained as the true owners of the property and that the understanding of all parties did not include the authority of Gill to grant a second mortgage on the King property. Being a witness to the act of sale through its attorney the bank was not a third person in legal contemplation. McDaniel v. Stoval, 25 La.Ann. 495 (1873); Brown v. Sadler, 16 La.Ann. 205 (1861).
Under these circumstances the act of mortgage dated June 27, 1978 in the sum of $85,000 bearing upon the King property is declared null and void and without effect, and an injunction shall issue from the trial court prohibiting foreclosure upon that mortgage by the bank. Insofar as the December 8, 1977 mortgage in the sum of $35,000 is concerned, the foreclosure may proceed in accordance with law. When the property has been sold at public auction the trial court shall determine the indebtedness of the Kings to Gill and adjudicate the rights of all parties, including the bank, to the proceeds of the sale.
For the reasons assigned, the ruling of the trial court is affirmed in part and reversed in part, and the case is remanded to the trial court to be proceeded with in a manner not inconsistent with this opinion.
NOTES
[*] Judge John Charles Boutall participated in this decision as Associate Justice Ad Hoc sitting in the place of Justice Marcus.
[1] See the most recent case in this Court, Martin v. Schwing Lumber & Shingle Co., 228 La. 175, 81 So.2d 852 (1955), where the Lumber Company's acquisition by ten years' prescription was denied because the company's attorneys had knowledge of Martin's undivided one-half interest in the property, the Court saying the attorneys' knowledge was to be imputed to the corporation. Similarly, in the most recent case to consider this issue. Barber v. Testa, 331 So.2d 139 (La.App. 3d Cir. 1976), one year's prescription was held to have barred a suit to annul a purported cash sale which was a security device with right of redemption. The Court of Appeal held that plaintiff's attorney had actual notice of the alleged fraud and that notice was to be imputed to the clients.