448 So.2d 1369 (1984)
FIRST NATIONAL BANK OF RUSTON, Plaintiff-Appellee,
v.
Robert L. MERCER, et al., Defendant-Appellant.
No. 16,099-CA.
Court of Appeal of Louisiana, Second Circuit.
March 26, 1984.
*1371 Boles & Mounger by Charles H. Ryan, Monroe, for defendant-appellant.
Barham, Adkins & Tatum by Charles C. Barham, Ruston, Hudson, Potts & Bernstein by B. Roy Liuzza, Monroe, for plaintiff-appellee.
Before MARVIN, SEXTON and NORRIS, JJ.
NORRIS, Judge.
Robert L. Mercer appeals a judgment declaring purported sales of property in Lincoln Parish, Louisiana, to be null and void. For the reasons hereinafter assigned, we affirm.

FACTS
In December, 1974, the First National Bank of Ruston, Louisiana acquired certain immovable property located on West California Avenue in Ruston via a foreclosure proceeding. Sam Thomas, Jr., president of the Bank at the time, initiated plans to sell the property. According to the testimony of Thomas at trial, Thomas contacted Mercer, a business acquaintance with whom Thomas had had previous dealings, about purchasing the property. Thomas testified that Mercer did not want to purchase the property directly because it was an eating establishment located in the immediate vicinity of a restaurant belonging to the parents of his wife. Furthermore, Mercer was already indebted to the Bank for the maximum loan amount permitted by the Bank's supervising agency. Therefore, according to Thomas, Mercer procured Thomas W. Craig, his employee of many years, to take title to the property for Mercer's benefit.
Conversely, Mercer claimed that Thomas wanted the property for himself and requested that Mercer purchase the property in Mercer's name for Thomas' benefit. When Mercer indicated he could not, Thomas asked if there was someone in Mercer's organization who could accomplish this purpose, and Craig was selected. Although at trial Mercer disclaimed any arrangement wherein he would personally benefit from the contemplated purchase, by earlier deposition, he testified that he understood that subsequent to the contemplated purchase and when the existing lease on the property terminated, he would be given the opportunity to participate in the operation of the restaurant.
*1372 On the other hand, Craig testified that Mercer wanted him to meet with Thomas and admitted having such a meeting in the presence of Mercer. Craig finally stated that the result of that meeting was purportedly a decision to have the property transferred into his name for the benefit of Thomas although in an earlier deposition Craig stated that he was to hold the property in his name for the benefit of both Mercer and Thomas.
Mercer then arranged a meeting between himself, Thomas and Craig to discuss the transfer. As can be seen from the sample of the testimony adduced at trial and set forth above, the testimony concerning the terms of the purported transfer to Craig is conflicting to say the least and sometimes incredibleas will be shown hereafter.
The testimony of Sam Thomas was the most forthright and nonevasive. He testified that Mercer agreed to purchase the property from the Bank for $100,000 and that it was to be placed in the name of Craig for Mercer's benefit. The purchase price was to be loaned by the Bank to Craig and secured by a mortgage in favor of the Bank executed by Craig affecting the property. Thomas had renegotiated the terms of a lease with the present tenant of the property which was to be signed by the Bank and Craig and the monthly rentals from that lease were to be paid to the Bank and applied to the loan payment. According to Thomas, Mercer authorized the Bank (orally at least) to deduct from his bank account the difference between the monthly rental and the loan payment. Thomas also testified Mercer verbally agreed to guarantee Craig's loan.
At best, Mercer's version of the discussion surrounding the transaction is vague. At worst, it is incredible for a man with Mercer's education and business experience. While admitting he took Craig to meet with Thomas and remained during the entire meeting, he stated that Thomas explained the "deal" to Craig but did not think that a purchase price was discussed or ever "settled on". At trial, Mercer first admitted he allowed the debiting of his account for the balance of the note payment. However, he later denied knowledge of the debits until he belatedly discovered them, also characterized them as allowed under economic duress, and finally testified that the debits were actually a loan to Thomas. This is all in spite of his earlier deposition testimony to the effect that Craig was to purchase the property for $85,000, that Mercer was aware there was to be a lease on the property, and that Mercer authorized a debit from his bank account to supplement the rentals to meet the payment on the property. Obviously, at his earlier deposition, Mercer's recollection was much clearer than it was at the trial.
An even more fascinating version of the details of the transaction is recalled by Craig. At trial, Craig testified that Thomas offered to "transfer" a piece of property into his name until a later date without any discussion of the details or mechanics of the transaction. According to Craig, not only was no price, debt or note discussed, but also he was not to be obligated in any manner, much less sign a note for any purchase price amount. This is all despite the fact that by earlier deposition he had testified that the purchase price was to be $85,000 to be represented by his note; and in answers to interrogatories and admissions, he had admitted that he was to receive a loan from the bank.
After the meeting in Thomas' office, Mercer and Craig went to James Hall's office to complete the transaction. Authority to sell the property to Craig had been granted by the Bank's board of directors at the December 10, 1974 meeting. Hall was given a cash deed transferring the property from the Bank to Craig for $100,000 cash, the receipt of which was acknowledged; a collateral mortgage and note for $125,000; and a hand note for $100,000; and perhaps a collateral pledge agreement in order to close the contemplated transaction. Again, the testimony regarding the attempted "closing" of the purported sale strains the imagination.
*1373 Although Craig testified that no purchase price was agreed on, that he didn't agree to pay anything and that he didn't buy anything, he freely admitted signing the collateral mortgage and note although he testified he really didn't notice them. However, he admitted that he balked at signing the $100,000 hand note because there was a discrepancy between the amount of $85,000 and $100,000 which Mercer, at his side and reviewing the papers, called to his attention. Craig testified that at this point "we stopped right there" until the matter could be discussed with Thomas. However, Thomas had left the Bank. Thereafter, Mercer and Craig left and at trial Craig testified he received the keys to the property and went and signed a new lease on the premises that Thomas had negotiated. However, in his previous deposition, Craig testified that after Mercer called the discrepancy to his attention he did not sign any more papers, left the Bank, went back to Natchitoches, and never bought the property because he did not finish the transaction. In that deposition he testified he knew nothing about a lease on the premises.
At trial, Mercer finally admitted he told Craig at some point he did not think the documents represented what Craig was to sign because Craig was not to sign any note since he was not paying for the property. However, in his prior deposition, Mercer testified he looked at the documents to be signed and noted that the figures had changed from $85,000 to $100,000.
James Hall did not remember any details of the transaction other than the fact it took place.
All the documents that evidence the transaction, i.e., the deed, collateral mortgage and note, hand note for $100,000 and collateral pledge agreement are dated December 31, 1974, and the deed and collateral mortgage were recorded by the Bank in the conveyance and mortgage records of Lincoln Parish, Louisiana, on January 2, 1975. The Bank also instituted the necessary book entries to show a loan by it to Craig for $100,000 based on the transaction.
Thomas terminated his association with the Bank in August of 1976, and the monthly payments on the debt were paid by the rentals and debits to Mercer's account until August of 1977. When the loan became in default Craig and Mercer were notified. Craig went to the Bank, talked to Hall and obtained copies of the papers he had signed and discovered that a signed hand note and collateral pledge agreement had been executed and that the signatures on these instruments were not his. He so informed Hall. A report of a hand writing expert was filed into evidence by stipulation which states that the hand note and collateral pledge were not signed by Craig. There is no evidence in the record as to who signed Craig's name to these documents that came to be in the Bank's possession other than Thomas' statement that his vague recollection was that he thought Mercer brought the notes back in. There is no evidence to indicate that anyone connected with the Bank signed or authorized Craig's signature on these instruments.
Hall testified that after the Bank considered the loan in default he contacted Mercer who at one point agreed to pay $20,000 and reschedule the loan but did not. Hall testified Craig informed him there was nothing that he could do about the matter.
After the foreclosure suit was filed Craig contacted Mercer who directed him to an attorney and went with him on several occasions to the attorney's office. In connection with the foreclosure suit, a notice of lis pendens was filed. The depositions of Mercer and Craig were taken on April 10, 1978. By this time all knew that a signed hand note and collateral pledge in possession of the Bank had not been signed by Craig.
Craig admitted that he never went on or exercised any incidents of ownership to the property in question until sometime in 1978 after the foreclosure suit was filed and he became aware that there was a deed of record in his name.
*1374 Subsequent to all the above eventsthe filing of the foreclosure suit, and the taking of the depositionsby deed dated April 13, 1977, Craig and his wife transferred to Mercer the subject property for a consideration of $100,000 represented by a note payable one year after date which was described as an in rem obligation only and which could not be personally enforced against Mercer. Mercer did not assume nor did the deed refer to the Bank's recorded collateral mortgage.
The Bank initially filed the foreclosure suit against Craig who reconvened and filed third party demands against Thomas and James Hall. Thomas and Hall reconvened and filed third party demands against Mercer. After the execution of the deed from Craig to Mercer, the Bank added Mercer as a defendant in the foreclosure suit and filed a second suit against Mercer and Craig seeking to rescind the purported sale for nonpayment of the purchase price, or alternatively to have it and a subsequent purported sale of the same property from Craig to Mercer declared null and void for failure of consideration, as a simulation, and because of error and fraud. Both suits were consolidated for trial.

ACTION OF THE TRIAL COURT
In written reasons, the trial court found that Thomas and Mercer had agreed that Mercer would acquire the property from the Bank and that the Bank would make a loan sufficient to cover the purchase price. Because Mercer's indebtedness to the Bank had reached the maximum, Mercer would have Craig take title to the property in order to circumvent the banking regulation which would preclude the Bank's loaning more money to Mercer. The trial court further found that at the closing and after the collateral mortgage and note had been signed, Mercer discovered the hand note was for $100,000 rather than $85,000 and instructed Craig, his agent, not to sign any further instruments. The trial court further found that Craig paid no price for the property, that throughout the transaction Craig acted at the direction of Mercer, and that the sale and loan arrangement was in fact a single transaction.
The trial court finally concluded that the transaction of the sale and mortgage was never completed because Mercer was under the impression the sale was for $85,000 and the testimony of Thomas, the act of sale and hand note indicated the Bank's understanding that the sale was to be for $100,000. Thus, the trial court concluded that neither Craig nor Mercer or the Bank consented to the sale or loan because the purchase price was never agreed upon. Therefore, the trial court declared the act of sale and collateral mortgage to be null and void for lack of consent as to the purchase price.
The lower court further concluded that Mercer was not a third party to the transaction entitled to rely on the public records, i.e., the cash deed that stated the Bank had sold the property to Craig for $100,000 and that the price had been paid. The court then declared that Mercer acquired no title to the property by virtue of the deed from Craig since Craig had no title to convey. Thus, the act of sale from Craig to Mercer was also declared to be null and of no effect.
Finally, the trial court allowed the Bank to retain the rentals paid under the lease because the Bank was ultimately found to have retained the ownership of the property but reserved to Mercer the right to seek reimbursement for any amounts paid by Mercer personally or debited from his account which were credited on the account of Craig. All reconventional and third party demands were denied.

ASSIGNMENTS OF ERROR
Mercer appeals contending that the trial court erred in:
(1) ordering the cancellation of the cash deed from First National Bank of Ruston to Thomas W. Craig, dated December 31, 1974 insofar as this deed affected the subsequently acquired rights of Mercer for the reason that the deed did not constitute a sale and that there was no meeting of the minds of the parties regarding the price and imputing that defect *1375 to Mercer because he was not a "third party" to the deed transaction; and
(2) holding that since no title was transferred to Craig by the Bank that thereafter Craig could not transfer any title to Mercer under the deed of April 13, 1978 and that said deed was null and void and should be cancelled.

FIRST ASSIGNMENT OF ERROR
In this assignment of error, appellant contends that the trial court erred in concluding that there was no valid sale from the Bank to Craig.
The general rule is that under La. C.C. Arts. 2236 and 2276, an authentic act is full proof of the agreement contained in it as against the contracting parties and their heirs and assigns. The exception to this general rule which has been repeatedly recognized by the courts is that where the party to an authentic act alleges that he executed it through fraud or error, he is permitted to introduce parol testimony to support such allegations. Franton v. Rusca, 187 La. 578, 175 So. 66 (1937); Unity Industrial Life Ins. Co. v. DeJoie, 202 La. 249, 11 So.2d 546 (1942); American Creosote Co. v. Springer, 257 La. 116, 241 So.2d 510 (1970); Paciera v. Benitz, 284 So.2d 827 (La.App. 4th Cir.1973).
The sale of immovable property executed in the form of an authentic act, which recites that the seller acknowledges receipt of the payment of the consideration therein stipulated, cannot be attacked by a party thereto on the ground that the consideration was not paid, unless the attacking party alleges fraud, mutual error or force, or unless the lack of consideration is indicated by answers to interrogatories or requests for admission to fact. Durham v. Evans, 377 So.2d 423 (La.App.2d Cir.1979); Cordova v. Cordova, 382 So.2d 1050 (La. App.2d Cir.1980).
In this case, parol testimony was freely admitted without objection to explain the dealings and intentions of the parties. While conflicting in many respects, the testimony is clear that the Bank intended to sell this property to Craig for the consideration of $100,000. Regardless of which version of Craig's and Mercer's testimony is believed, it is also clear that no meeting of the minds occurred as to the consideration or purchase price. It was either believed by Craig and Mercer to be $85,000 or there never was an agreed upon purchase price. Whatever the intent of Craig and/or Mercer, the trial court was certainly not clearly wrong in its finding that there was no agreed upon price or consent to the sale at an agreed price. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Therefore, as between the Bank and Craig, there was no contract of sale that can be given legal effect. La.C.C. 2439; Catyb v. DeVille, 246 So.2d 41 (La. App.3d Cir.1971); Manuel v. Pitre, 389 So.2d 774 (La.App.3d Cir.1980); Mulina v. Tate, 393 So.2d 259 (La.App. 1st Cir.1980).
Furthermore, it is noteworthy that Craig frankly admits that he paid no consideration to the Bank. Error was alleged by the Bank and the lack of payment of any consideration by Craig is certainly indicated by his answers to interrogatories and request for admissions of fact found in the record. The more credible evidence preponderates that a sale was indeed contemplated between the parties even though a price was never agreed upon, and both parties understood that the Bank would loan Craig the funds to purchase the property to be secured by a valid mortgage on the property. The entire transaction (sale and loan) was never actually consumated because Craig, at Mercer's instruction, refused to complete it after realizing that there was no agreement as to the purchase price.
To accept Mercer's contention that the Bank was actually paid the consideration for the property under the facts of this case would be untenable and an unrealistic result. The facts are as the trial court found. The entire transaction was never completed and the Bank was never actually paid the purchase price. Therefore, the deed from the Bank to Craig is a null and void; thus, title never in fact passed from *1376 the Bank to Craig. See Durham v. Evans, supra; Cordova v. Cordova, supra.

SECOND ASSIGNMENT OF ERROR
Mercer next argues that despite the invalidity of the transaction between the Bank and Craig he cannot be affected thereby because he is a third party who purchased from Craig in reliance on the public records; that is, the deed from the Bank to Craig which stated a purchase price acknowledged to have been paid. In reality, it is obvious that Mercer's real contention is that he owns the property free of all encumberances despite the fact that the Bank has never been paid.
In Louisiana, interests which are subject to the recordation law but are unrecorded are null and void as to third persons having actual knowledge of the unrecorded interest. McDuffie v. Walker, 125 La. 152, 51 So. 100 (1909). However, recordation is not the source of rights. As stated in 39 Tul.L.Rev. 491, 495:
It may be further observed, from the negative character of the law of recordation, that recordation does not purport to be and is not itself the source of rights. A recorded purchase from the legal owner transfers ownership to the purchaser, not because of the recordation, but because of the purchase. While the unrecorded purchase from the owner does not transfer ownership insofar as third persons are concerned, a recorded purchase from one not the owner does not transfer ownership at all .... [Emphasis added.]
In Gulf's South Bank and Trust Co. v. Demarest, 354 So.2d 695 (La.App. 4th Cir. 1978), purchasers/appellants purchased a home that they believed to be free of mortgages because the mortgages were shown to be cancelled on the public records by documents which were later proved to be fraudulent. The court held that the presence of the fraudulent releases in the public records only entitled the purchasers to introduce the releases into evidence, as against third parties and that the releases remained forgeries which were invalid and incapable of waiving the mortgagees' rights or of freeing the home from the mortgages despite their having been recorded stating:
Appellants stress their freedom from fault, although they concede the mortgagees' equal innocence. They also claimed protection of "the legal doctrine that persons in good faith buying real estate or acquiring a mortgage or lien on realty can rely on public records in determining ownership or encumberances of real property."
This argument overstates Louisiana recordation law. It omits to address the problem of the radical invalidity of forged instruments affecting land; if a good-faith mortgagee could lose his mortgage because of fraudulent release bearing a forgery of the mortgagee's signature as recorded than a homeowner could lose his home because of a fraudulent sale or mortgage bearing a forgery of the home-owner's signature as recorded.
Louisiana recordation law is to the contrary; recordation does not create rights at all, much less grant validity to forgeries. [Citations omitted.] Rights of purchasers and conventional mortgagees in immovable property are created by the act of purchase or mortgage from the owner. * * * But being recorded * * * is not proof of anything, and particularly it is neither proof nor promise of the genuineness or validity of the recorded or written instrument which alone can be the source of the rights asserted. All that recordation does for an instrument, valid or fraudulent, is to permit its introduction into evidence for purposes of asserting its validity against third persons.
Therefore a third person can rely upon absence from the records (non-recordation) as guaranteeing ineffectiveness of an instrument required to be recorded. But he cannot rely upon the presence in the records (recordation) of the instrument, because the only effect of recordation is admissibility into evidence with *1377 effectiveness against third parties. [Footnotes omitted.]
In the instant case, the evidence which conclusively shows the invalidity of the sale from the Bank to Craig was parol. It was admissible under the above stated rules. Further, not only did Mercer or any other party not object to the admission of this evidence at trial but also in fact Mercer provided a great deal of that evidence. Because Louisiana's parol evidence rule [La.C.C. Art. 2276] is evidentiary in nature and not substantive, if not invoked at trial via proper objection, the right to later object to such evidence which may or may not be admissible is waived and may not later be invoked in an attempt to exclude evidence. Wade v. Joffrion, 387 So.2d 1265 (La.App. 1st Cir.1980).
Accordingly, based on the evidence contained in this record, we conclude that the trial court did not err in nullifying the sale from Craig to Mercer for several reasons.
As discussed in connection with Assignment of Error No. 1, the evidence conclusively shows that not only was there a lack of consent to the purchase price in the original transaction between Craig and the Bank but also there was a failure of consideration because no consideration was paid to the Bank from Craig. This is not disputed, by any of the parties, including Mercer. Accordingly the judicial dissolution of this sale because of this failure of consideration provides a basis for nullifying the subsequent sale from Craig to Mercer. In Durham v. Evans, supra, this court concluded that a judgment which annulled and dissolved a sale had the effect of freeing the property from a subsequent conveyance:
Article 2045 of the Civil Code provides that the dissolving condition is that which, when accomplished, operates a revocation of the obligation, placing matters in the same state as though the obligation had not existed.
In Sliman v. McBee [311 So.2d 248 (La.1975)], supra, our Supreme Court annulled a sale of immovable property on the grounds that the purchase price had not been paid, and in so doing it also decreed that the property was to be returned to the seller free and clear of any mortgages or other encumberances and placed thereon by the seller. In that connection the court said:
The only question that remains is whether the return of the property is to be free and clear of the mortgages given by the McBees to the bank to secure the loans made to them. The answer here is well settled. We stated in Stevenson v. Brown, 32 La.Ann. 461, 464 (1880) that `[a] demand in resolution is a demand for the property itself, and embraces in it the abrogation of any and all alienations and encumbrances placed upon it by the vendee.' (Emphasis added.) The failure of the purchaser to pay the sale price causes the resolutory condition to take effect, which places matters in the same state as though the obligation had not existed, La. Civil Code, arts. 2045-47, 2561 (1870). Thus, judicial dissolution of a sale for non-payment of the price frees the property of all mortgages created by the purchaser. E.g., Adler v. Adler, 126 La. 472, 52 So. 668 (1910) and authorities cited therein.
The same court said in Adler v. Adler, supra, where a somewhat similar issue was presented: "That the judicial dissolution of a sale of real estate for nonpayment of the price frees the property from all mortgages and charges created by the purchaser, or resulting from his possession as owner and the operation of law, is too well settled for dispute."
In Stevenson v. Brown, supra, the Supreme Court said "a demand in resolution is a demand for the property itself, and embraces in it the abrogation of any and all alienations and encumbrances placed upon it by the vendee." * * *
That rationale is equally applicable herein and compels the same result; that is, the judicial decree which dissolved and annulled *1378 the sale from the Bank to Craig had the effect of freeing the property from the subsequent conveyance made to Mercer.
The trial court concluded that Mercer was not entitled to third party status under the rationale of King v. People's Bank and Trust Co., 371 So.2d 257 (La.1979). In that case, it was held that a bank was not a third party entitled to the protection of the public records doctrine because it was concluded from the facts and circumstances that the attorney for the bank was a witness to the act of sale because he signed the sale as notary. As the bank's attorney, he designed the entire loan package under their instructions and in keeping with their policy in such cases. It was concluded that his actions were in fact the actions of the bank and his knowledge should be imputed to the bank as much as would be the case if the President of the bank had signed the deed as a witness, and that as a witness to the sale, the bank, acting through its attorney, was aware that the sale was meant to be without consideration. Accordingly, the bank was not a third person in legal contemplation. See also McDaniel v. Stoval, 25 La.Ann. 495 (1873); Brown v. Sadler, 16 La.Ann. 206 (1861) cited therein.
While at first glance, King appears to be factually distinguishable rather than analagous, the facts of the instant case when viewed closely may even be stronger than those present in King. While admittedly Mercer was not an attorney for Craig, he was at least his partner, advisor, and/or promotor in arranging and carrying out the transaction between Craig and the Bank. Whatever knowledge was available to Craig was certainly available and known to Mercer. Mercer was the party who procured Craig to purchase the property; he was present during all of the discussions and the negotiations surrounding the transaction. Mercer knew that the purchase price was not agreed upon, knew that Craig had refused to sign further papers after this fact was brought to light and knew that Craig was of the opinion that the transaction had been cancelled until demand for payment was made upon him. Even more noteworthy is the fact that it was Mercer, rather than Craig, who discovered the discrepancy in the purchase price and insisted that Craig sign no further documents thereafter. Finally, it was Mercer who directed Craig to an attorney after the foreclosure suit was filed and the resulting notice of lis pendens was recorded. Accordingly, under the strong facts of this case, we feel it appropriate to conclude that Mercer was at least as knowledgable about this transaction as Craig, or any other party, witness, or attorney, if not more so. However, we find it unnecessary to determine whether this factual situation is governed by La.C.C. Art. 3342 et seq. and whether La.C.C. Art. 3344 would preclude Mercer from asserting third party status.
After the foreclosure suit was filed, the depositions of Mercer and Craig were taken. Mercer was present at the deposition of Craig and heard his testimony that the purchase price was never agreed upon or paid and that he never considered himself to have purchased the property. Nevertheless, after the foreclosure suit was filed, after these depositions were taken, after much discussion between Craig and Mercer and after much discussion between Mercer and his attorneys, a deed from Craig to Mercer was executed. That instrument, dated April 13, 1978 is shrouded in suspicious circumstances and the ultimate consideration given in satisfaction of the $100,000 in rem note was proved to have been concocted between the parties thereto. Without further elaboration, sufficeth to say that we are convinced that any fair reading of this record will convince anyone that a prima facie case of fraud was proven by clear and convincing evidence. It is obvious that Craig and Mercer, knowing all the facts surrounding the initial transaction became aware of the Bank's vulnerable position after which they conspired and schemed to deprive the Bank of this property without paying for it. In actuality, Mercer does not attempt to rely on the public records to protect himself but in fact attempts to use them as a cloak in furtherance of his fraudulent scheme. The rule is well established that fraud vitiates *1379 all things, notwithstanding the public records doctrine. McDuffie v. Walker, supra. See also Todt v. Todt, 237 La. 168, 110 So.2d 566 (1959); Acadian Production Corp. of La. v. Savanna Corp., 222 La. 617, 63 So.2d 141 (1953); Cuselich v. Cuselich, 159 La. 652, 106 So. 20 (1925). A party to a fraudulent transaction can never take advantage of the fraud. Bernard v. Auguste, 1 La.Ann. 69 (La.1846). The rule has always been that the public records doctrine does not protect a third party purchaser, where there has been fraud or forgery. Keller Building Products of Baton Rouge, Inc., v. Siegen Development, Inc., 312 So.2d 182 (La.App. 1st Cir.1975). Accordingly, we conclude that Mercer can find no protection for his actions by relying on the public records doctrine because we hold that a person can not use the public records doctrine to perpetrate a fraud. Compare Broussard v. Doucet, 236 La. 217, 107 So.2d 448 (1958).
For the foregoing reasons, the judgment of the trial court is affirmed in its entirety.
JUDGMENT AFFIRMED.